289 So.2d 656

**Harold Augustus TRAMMELL**

**v.**

**STATE.**

**6 Div. 264.**

Court of Criminal Appeals of Alabama.

Oct. 30, 1973.

Rehearing Denied Dec. 4, 1973.

Lipscomb & Lipscomb, Bessemer, Beddow, Embry & Beddow, Birmingham, for appellant.

William J. Baxley, Atty. Gen., and David W. Clark, Asst. Atty. Gen., for the State.

HARRIS, Judge.

Appellant was convicted of murder in the second degree and his punishment fixed at imprisonment in the penitentiary for a term of fifteen years. At arraignment he interposed the plea of not guilty.

Appellant is white and the deceased was a non-white female. She was his mistress or paramour. He was a partner in a sales company being operated in Bessemer, Alabama. The deceased came to work for the company in the summer of 1967 and in two or three weeks thereafter the affair began and continued until shortly before appellant shot and killed her on May 8, 1970.

The deceased lived in an apartment on the property of her father located directly behind the place of her employment. It is not disputed that appellant visited the deceased in her apartment and at times stayed all night. There was some testimony that he spent some weekends in the apartment with her. Appellant denied that he stayed with the deceased on weekends but freely admitted spending the night with her. This was not an open and notorious affair and neither was it a clandestine one. His partner in business said he had no knowledge that anything was going on between appellant and the deceased.

Her sister, brother-in-law, and other witnesses testified that they frequently visited the deceased in her apartment and found appellant in her bed in a state of undress. The deceased would open the door to these visitors clad in night clothes or a housecoat. A color photograph of appellant, deceased and her mother and father, taken in her parents' home, was introduced into evidence.

Appellant testified that he gave the deceased money and furnished her with groceries in exchange for her favors. He said he broke off the affair in January, 1970, prior to the fatal shooting on the late afternoon of May 8 of that year. In breaking off with her, he testified, "I just told her what we were doing was wrong, that it would be better if we quit, and that she would get a man of her own color and more of her own age. I told her I was ashamed of what I had been doing, that I was drinking too much and I was going to quit."

According to the testimony of the sister of the deceased and the brother-in-law, appellant told them the deceased told him she did not want to go with him any more and that he was going to let her go.

A few weeks before her death the deceased started dating a man of her own race. This man testified that he had been going with the deceased about two months and they had discussed marriage.

The twelve-year-old daughter of the deceased testified that appellant called her on the telephone on Saturday night before her mother was killed the following Friday and offered her money to tell him all about her mother and the other man she was dating. The daughter said she told her mother about the telephone call but no one else.

It was the state's theory that the deceased had grown weary of the miscegenetic life she was living with appellant and wanted to end the relationship; that appellant became jealous of the romance then blooming between deceased and the man she had started dating; that he became enraged over the imminent prospect of being cast in the role of a jilted lover and decided that if he could not have her then no one would have her. This, claims the state, was the motive for the killing.

Appellant denies that any such motive brought on the killing; that he was forced to shoot in defense of his life. He testified that on the day of the homicide the deceased was drinking beer in his place of business in the presence of customers; that when the customers left the premises he told her she could not drink beer in his place and the deceased said, "Let me drink my ---- beer." He told her she was fired and to call up the bookkeeper and get the amount of her pay; that he then went to the storage room in back of the store to get some supplies to place up front. There was no light in the storage room except that which filtered in while the door was open; that while he was bent over to pick up a box he became aware that someone was in the storage room with him and he realized the deceased had followed him. He heard her say that "no damn ---- ---- was going to fire her." He saw her hand at her waistline where she usually carried a box cutter (a handle with a razor blade affixed thereto which she used to cut open

pasteboard boxes) and that he threw up his arm to protect himself and grabbed his gun and in so doing he struck her and knocked her into some boxes. At this time he was standing on a pallet and his pistol was in his hip pocket. These gyrations caused him to lose his balance and he fell against a door facing and his pistol went off. He saw something shiny like metal and as he went out the door he fired again. He doesn't remember firing the third time. The officers searched the storage room for a knife but did not find one. A paring knife was found on the counter up front. The following August while moving boxes in the storage room, appellant's son or partner found a box cutter and notified the officers.

Three slugs entered the body of the deceased. There was an entrance wound in the right side of her neck which ranged upward and exited the left jaw. There were two entrance wounds in the back and these slugs went through her body. It was appellant's contention that the bullet that entered the right side of deceased's neck was so powerful that it caused her body to turn, hence the two entrance wounds in her back. At any rate there was sufficient testimony, if believed, to submit the issue of self defense to the jury. The jury rejected appellant's self defense plea and he is under a $10,000.00 bond pending appeal.

■ Appellant urges a reversal because of the action of the trial court in refusing to give six written instructions to the jury. The court gave twelve written charges to the jury and a very comprehensive oral charge. Other than the six refused charges, appellant does not claim there are any other errors necessitating a reversal.

Refused charge 18 reads as follows:

"I charge you, members of the jury, that Harold A. Trammell enters into this trial with the presumption of innocence, and this is a fact in this case, which must be considered with all the evidence and cannot be disregarded by you."

On the question of the presumption of innocence, the court in its oral charge said:

"On the contrary, to the non-presumption of guilt, the law of Alabama presumes that any person charged with any criminal offense is innocent until the jury is convinced beyond a reasonable doubt and to a moral certainty of the guilt of the fact that the man charged is guilty, and that presumption of innocence avails itself around this defendant from the minute he comes into this courtroom until the point where you are convinced beyond a reasonable doubt and to a moral certainty of his guilt. And unless you are so convinced from the evidence, then you would not be authorized to convict him."

Refused charge 18 was substantially covered in the above excerpt from the oral charge of the court. No error intervened here.

Refused charge 20 reads:

"I charge you, members of the jury, that the jury are instructed that if you believe, from the evidence, that the defendant at the time of the slaying was in the building where he was doing business, and which was occupied by him as his place of business, and that he was there assailed by the deceased under such circumstances as to reasonably impress him with the belief that his assailant intended to inflict on him great bodily harm, and that there was imminent danger that such injury would be inflicted upon him, then the defendant had the right to repel such assault by shooting the deceased, then he must be acquitted, provided he did nothing to provoke the assault."

In the oral charge the court instructed the jury as follows:

"Then, the other element of self-defense is that if a man is free from fault in bringing on the difficulty and is placed in an imminent danger, he must retreat, if a retreat can be made without increasing the danger to himself. However, that principle doesn't apply in cases where the accused is on his own property, in his own premises. In other words, if you were in your home, in your yard or on your property, and if a difficulty arises, and you are free from fault in bringing it on, and you are placed in a position of danger, the law says you are the owner of that property or in the legal possession of it, that you are under no duty to retreat, that you can stand your ground if necessary if you're in danger of losing your life, you can take the life of your assailant. Those are the elements of self-defense."

Given charge 33 reads as follows:

"I charge you, members of the jury, that you are instructed that, while the law requires, under certain circumstances, that a person assailed shall avail himself of all reasonable means of escape from the danger before he is excused from taking the life of his assailant, yet it is never required that he shall leave his home or place of business to escape such danger."

■ The above excerpt from the oral charge, together with given charge 33 adequately covers the doctrine of retreat and there was no error in refusing written charge 20.

The same principle of law enunciated in refused charge 21 on the duty to retreat is embodied in given charge 33 as well as the oral charge of the court.

Refused charge 34 reads:

"I charge you, members of the jury, the fact that the defendant made no statement to the officers after his arrest or taken into custody, cannot be used to draw any inference as to his guilt or innocence, and I further charge you that it is his constitutional right to so not make a statement, and that after counsel is obtained by the defendant it would be a violation of the law for the officers to endeavor to further interrogate him."

Written charge 35 given at the request of appellant reads:

"I charge you, members of the jury, that a defendant has a constitutional right to remain silent when taken into custody, and I further charge you no inference of guilt or innocence may be drawn from silence."

Given charge 35 adequately and substantially covers refused charge 34 and there was no error in the refusal of the latter charge.

Refused charge 23 reads:

"I charge you, members of the jury, that if the evidence, or any part thereof, after a consideration of the whole of such evidence, generates a well-founded doubt of defendant's guilt, the jury must acquit him."

Given charges 11 and 32 are as follows:

"I charge you, members of the jury, that it is the duty of the State of Alabama to prove every material fact charged in the indictment to a moral certainty, and to satisfy the minds of the jury of the defendant's guilt beyond all reasonable doubt, and if the State of Alabama has failed to do this, and the jury can account for the defendant's innocence upon any reasonable hypothesis, in view of all the evidence, then you should find him not guilty."

"I charge you, members of the jury, that a doubt which justifies an acquittal may be a reasonable one growing out of a failure of the evidence to produce an abiding conviction in the minds of the jurors of the facts necessary to make out the State's case."

Given charges 11 and 32, together with the court's oral charge fairly and substantially covers the principles of law embodied in refused charge 23 and there was no error in the refusal of this charge.

Refused charge 24 is as follows:

"I charge you, members of the jury, that it is not necessary under the evidence in this case, that this defendant was actually in danger of death or great bodily harm at the time he shot the deceased. He had the right to act on the appearances of things at the time, taken in the light of all the evidence, and he had the right to interpret the conduct of the deceased in the light of any threat that the evidence proves the deceased to have made against the defendant. If the circumstances of the killing were such as to justify a reasonable man in the belief that he was in danger of great bodily harm, or death, and he honestly believed such to have been the case, then he had a right to kill the deceased in his own defense, although as a matter of fact, he was not in actual danger, and if the jury believe from all the evidence that the defendant acted under such conditions and circumstances as above set out, the burden of showing that the defendant was not free from fault in bringing on the difficulty is on the State, and if the State has not shown this by the evidence, the jury should acquit the defendant."

As pointed out in this opinion, appellant claimed the deceased made direct threats against him. From the record:

"Q. All right. Now, prior to the 8th day of May, 1970, had this individual ever threatened you?

"A. Yes, sir.

"Q. And approximately how long prior to the 8th day of May had she threatened you?

"A. About two or three weeks.

"Q. What, if anything, did this individual say to you, or what conversation did you have with her prior to this statement being made?

"A. She said she would get me if it was the last thing she ever did.

"Q. What was said or done before she made that statement, Mr. Trammell?

"A. I had asked her or told her to go in the back to work the float of sugar.

She said she didn't hire out to work the sugar. I said she had hired out to work sugar or flour or wash the sink or put the stock up or whatever was needed to be done, but she said she didn't hire out to do that. I said 'Go ahead and do it, or get your things and go home.'

"Q. Did she do it?

"A. Yes, sir.

"Q. Sometimes later, did she go back to getting the sugar?

"A. Yes, sir.

"Q. Is that when she made the statement, 'I'll get you if it's the last thing I do.'

"A. Yes, sir.

"Q. I'll ask you if later a woman customer came into your store?

"A. Yes, sir.

"Q. Will you describe her dress to this jury?

"A. Well, the dress was sleeveless, didn't have any sleeves.

"Q. Would you describe the back of this woman's arms and shoulders?

"A. Full of scars.

"Q. Did Juanita point out that woman to you in the store?

"A. Yes.

"Q. What, if anything, did she say about that woman?

"A. She said, 'Do you see that?' And I said, 'Yes.' She said, 'I done that; you remember it.'

"Q. And this all occurred before she came in and said said no so and so is going to fire me?

"A. Yes, sir."

■■ The distinguished trial judge did not cover the principle of law enunciated in charge 24 in his oral charge to the jury, nor does it appear in any of the given charges. The evidence for the appellant, though thin and shaky, tended to prove his plea of self defense. Under this state of the evidence, written charge 24 should have been given. This was error to a reversal. Huff v. State, 23 Ala.App. 426, 126 So. 417; Davis v. State, 214 Ala. 273, 107 So. 737; Bluett v. State, 151 Ala. 41, 44 So. 84; Richardson v. State, 191 Ala. 21, 68 So. 57; Glass v. State, 201 Ala. 441, 78 So. 819.

For the error indicated, the judgment is reversed, and the cause remanded.

Reversed and remanded.

All the Judges concur.